NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11975


ELLEN DUFF-KAREORES  vs.  CHRISTOPHER KAREORES.


Essex.     February 10, 2016. - June 15, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.


Divorce and Separation, Alimony, Division of property.


Complaint for divorce filed in the Essex Division of the
Probate and Family Court Department on June 19, 2013.

The case was heard by Peter C. DiGangi, J.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


James P. Hall (Jaclyn Martin with him) for Christopher
Kareores.
John Foskett for Ellen Duff-Kareores.


DUFFLY, J.  Ellen Duff-Kareores and Christopher Kareores

were first married to each other in May, 1995; two children were

born of the marriage before the parties divorced in 2004.  The

parties' divorce agreement, which was incorporated in the

divorce judgment, obligated Christopher to, among other things,

pay Ellen alimony in the amount of $7,600 per month. Beginning in 2007, Christopher resumed living with Ellen and the children in what had been the marital residence. In December, 2012, the parties remarried. In June, 2013, Ellen filed a complaint for divorce on the ground of an irretrievable breakdown of the marriage and served the complaint on Christopher the following month. Following trial on that complaint, a judge of the Probate and Family Court concluded that, under the Alimony Reform Act of 2011, St. 2011, c. 124 (alimony reform act or act), the length of the parties' marriage for purposes of calculating the durational limits of a general term alimony award to Ellen was eighteen years, the period from the date of the parties' first marriage through the date that Christopher was served with the complaint in the second divorce. Christopher appealed, and we transferred the case to this court on our own motion.

This case requires us to decide whether the judge correctly construed G. L. c. 208, § 48, which provides that "the court may increase the length of the marriage if there is evidence that the parties' economic marital partnership began during their cohabitation period prior to the marriage." We conclude that the judge's findings do not support a determination that the parties had an economic marital partnership, within the meaning of G. L. c. 208, § 48, during the period following the service

on the husband of the divorce complaint in the first marriage in April, 2003, until the parties began cohabiting in May, 2007. The findings do, however, support a determination that the length of the marriage includes the period during which the parties were cohabiting before they remarried, and the period of the parties' first marriage. Thus, the over-all length of the marriage here should be calculated by adding together the period of the first marriage, the period of cohabitation beginning in May, 2007, and the period of the second marriage. Accordingly, the matter must be remanded to the Probate and Family Court for recalculation of the amount and duration of alimony. Because of the change in the length of the parties' marriage, in the course of the proceedings on remand, Christopher also may seek reconsideration of the judge's orders as to property division and allocation of the children's education expenses.

Background. We summarize the judge's findings of fact, supplemented by undisputed facts in the record and reserving certain facts for later discussion. See Pierce v. Pierce, 455 Mass. 286, 288 (2009). The parties first married on May 20, 1995. Ellen was employed full time as a registered nurse, and Christopher was working as a medical resident. Their first child, a daughter, was born in 1997; their son was born in 2001. Soon after the birth of their first child, at around the time that Christopher completed his medical training and began

employment as a fully qualified physician, Ellen left her position as a registered nurse to attend to raising their daughter and running the household. Although she worked part time in the years that followed, Ellen did not return to full-time employment.

In March, 2003, Ellen served Christopher with a divorce complaint, and in 2004, a divorce judgment nisi issued that incorporated the parties' separation agreement. The agreement included merged provisions relating to their minor children, alimony, and life and medical insurance, as well as provisions related to property division that did not merge. The agreement required Christopher to pay alimony to Ellen in the amount of $7,600 per month.[1] As provided under the terms of the agreement, the parties refinanced their mortgage so that Ellen could purchase Christopher's interest in the family home, and she continued to live there with the children.

In May, 2007, Christopher moved back into the family home and the parties began a period of cohabitation, which continued until they were remarried in December, 2012. The judge found that, after Christopher returned to living in the family home, "the parties functioned exactly as they had during their

---

[1] Under the terms of the agreement, Ellen had primary physical custody of the children. Because the agreement does not contain a separate provision for child support, we presume that the amount of the alimony award includes payments for the support of the children.

previous marriage," with Christopher acting as the primary wage earner and Ellen as the primary caretaker of the children and the home. During this period, and throughout the second marriage, Christopher continued to pay Ellen a monthly amount that was consistent with the alimony order under the first divorce judgment. Six weeks after the second marriage, at Ellen's request, Christopher moved out of the family residence. On July 18, 2013, Ellen served Christopher with a complaint for divorce.

The judge who conducted the second divorce trial concluded that, throughout their eighteen-year relationship, the parties enjoyed an upper-middle income lifestyle. At the time of trial on the second divorce, Ellen was fifty-three years old and Christopher was fifty-one. Christopher was in good health and Ellen suffered from fibromyalgia and sarcoidosis.[2] The judge found that Ellen "testified credibly that these [illnesses cause] symptoms [that] affect her work as a registered nurse." She worked part time and earned weekly income in the amount of $450. Christopher was employed full time as an emergency room physician and held an additional part-time position at another

---

[2] The judge found that Ellen "was diagnosed with sarcoidosis seventeen years ago," which causes her to suffer from "shortness of breath, cough, fatigue, myalgia, and arthralgia." When her symptoms flair up, she "must undergo treatments, including chemotherapy, medication and physical therapy." She also suffers from fibromyalgia, which causes muscle pain that can be "debilitating."

hospital, earning a total gross weekly income of $7,867.48.[3] The judge found that Christopher had the opportunity to acquire future assets and income through his employment, while Ellen's opportunities were limited because of "significant health issues," having left full-time work to raise the children, and having bypassed employment opportunities to focus on the children in the period of the parties' cohabitation between the two marriages.

The judge found that the length of the second marriage was six months. However, the judge found that

> "the parties' economic marital partnership began during their cohabitation period prior to the marriage. The parties began living together in May, 2007 (6.17 years). Additionally, the parties were married for 7.83 years prior to their first divorce. The parties have been in a relationship, with only a brief period of separation, for eighteen years (i.e. the number of years between the parties' first marriage and the date of service on the current Complaint for Divorce)."

The judge concluded that "[b]oth parties contributed to their financial success throughout the course of their relationship," but Ellen contributed "more" because she "worked part-time and was, for the most part, fully responsible for the child care and homemaking responsibilities."[4]

---

[3] The judge determined that Christopher did not disclose on his financial statement the sum of $9,180.00 that he had contributed to a retirement account, or that he had received an additional $44,440.00 in profit sharing from his medical practice.

[4] The judge found that Ellen was responsible for the "vast

A judgment nisi was entered on the parties' second divorce on December 5, 2014. Under the terms of the judgment, Christopher was ordered to pay Ellen weekly general term alimony in the amount of $1,106 for a period of fourteen years. In making this determination, the judge considered the required factors under G. L. c. 208, § 53 (a), including "the length of the marriage; age of the parties; health of the parties; income, employment and employability of the parties . . . ; economic and non-economic contribution of both parties to the marriage; marital lifestyle; . . . [and] lost economic opportunity as a result of the marriage." The judge also ordered Christopher to make weekly child support payments to Ellen in the amount of $917. Concerning education expenses for the two children, the judge ordered Christopher to continue paying private secondary school expenses for the younger child.[5] The older child was a senior in high school when the judgment entered; the judge ordered Christopher to pay eighty per cent and Ellen to pay

---

majority of the cleaning, shopping, cooking, and laundry," and was "primarily responsible for the child care responsibilities," including, among other things, preparing meals, bathing, and transporting the children to and from school.

[5] The judge found that, "[b]y agreement of the parties, the children have been raised Catholic and have always attended Catholic private school. The prior divorce judgment provides that the children will attend private school if [Christopher] pays the cost, an acknowledgment that [Ellen] was not in a financial position to contribute to same."

twenty per cent of the costs of that child's college education.[6]

As to the only substantial marital asset,[7] Christopher's

retirement accounts, the judge awarded fifty-five per cent to

Ellen because she "contributed more to the financial success of

the parties throughout their relationship."  In making this

division of the marital property, the judge stated that he had

considered, among the other factors listed in G. L. c. 208,

§ 34, the length of the marriage and the alimony award.

Discussion.  Christopher contends that the judge exceeded

his authority in the amount and duration of alimony awarded, in

the division of the marital assets, and in the allocation of the

children's educational expenses.  The thrust of Christopher's

argument is that the judge's erroneous calculation of the length

of the parties' marriage, based on their economic marital

relationship, "clearly controlled" all of the judge's findings.

Because the parties' second marriage lasted only six

months, the question we confront is whether the judge properly

---

[6] No provision was made for the payment of the younger child's college expenses.  See Passemato v. Passemato, 427 Mass. 52, 54 (1998) ("as a general rule, support orders regarding the future payment of post-high school educational costs are premature and should not be made").

[7] Neither party disputes the judge's finding that Christopher's retirement accounts are the only substantial marital asset.  The record reflects that Ellen owns the marital home, which has a fair market value of $435,000, but at the time of the parties' second divorce, was subject to a first and a second mortgage, together totaling $418,200.

included within the "length of the marriage" all or any portion of the following:  the period of approximately five and one-half years during which the parties lived together after the first marriage ended and before they remarried; the slightly more than four-year period that they were neither married to each other nor living together; and the approximately eight-year period of their first marriage.[8]  In making this determination, we consider whether the judge's calculation of the parties "length of the marriage" is consistent with the meaning of that term under the alimony reform act.  This involves a question of statutory interpretation, which we review de novo.  See Chin v. Merriot, 470 Mass. 527, 531 (2015).  "Although we look first to the plain language of the provision at issue to ascertain the intent to the Legislature, we consider also other sections of the statute, and examine the pertinent language in the context of the entire statute.  Id. at 532.  See Holmes v. Holmes, 467 Mass. 653, 659 (2014) ("we look first to the language of the relevant statute, which is generally the clearest window into the collective mind of the Legislature").

General Laws c. 208, § 48, enacted as part of the alimony reform act, defines the "[l]ength of the marriage" as

> "the number of months from the date of legal marriage to
> the date of service of a complaint or petition for divorce

---

[8] Ellen served Christopher with a complaint for divorce in the first marriage on March 12, 2003.

or separate support duly filed in a court . . . ; provided, however, that the court may increase the length of the marriage if there is evidence that the parties' economic marital partnership began during their cohabitation period prior to the marriage."

The terms "economic marital partnership" and "cohabitation" are not defined in G. L. c. 208, § 48, nor anywhere else within the alimony reform act.  But a related provision addressing general term alimony[9] states that general term alimony "shall be suspended, reduced or terminated upon the cohabitation of the recipient spouse when the payor shows that the recipient spouse has maintained a common household . . . with another person for a continuous period of at least [three] months."  G. L. c. 208, § 49 (d).  See Hartford Ins. Co. v. Hertz Corp., 410 Mass. 279, 284 (1991) (in construing statutory term, "we may also look to relevant provisions of other parts of the statute").  In order to ascertain whether a former spouse who is cohabiting with another is maintaining a "common household," a judge may consider any of the following factors:

"(i) oral or written statements or representations made to third parties regarding the relationship of the persons;

"(ii) the economic interdependence of the couple or economic dependence of [one] person on the other;

"(iii) the persons engaging in conduct and collaborative roles in furtherance of their life together;

---

[9] "'General term alimony' . . . [is] the periodic payment of support to a recipient spouse who is economically dependent." G. L. c. 208, § 48.

"(iv) the benefit in the life of either or both of the persons from their relationship;

"(v) the community reputation of the persons as a couple; or

"(vi) other relevant and material factors."

G. L. c. 208, § 49 (d) (1).

Viewing the statute as a whole, we conclude that the Legislature intended to use the terms cohabitation, economic marital partnership, and common household to describe a relationship that, if established, would affect a court order for alimony, either by increasing the amount and duration of alimony ordered or by reducing, suspending, or eliminating the award.  As explained, G. L. c. 208, § 48, permits a judge to increase the "length of the marriage" based on a period of cohabitation prior to a marriage where there is evidence of an "economic marital partnership," which in turn permits the judge to increase the duration of an alimony award.  See G. L. c. 208, § 49 (b).  See also G. L. c. 208, § 53 (a) (governing both amount and duration of alimony and requiring consideration of length of marriage among other factors).  General Laws c. 208, § 49 (d), permits a judge to suspend, reduce, or terminate a general alimony award based on a recipient spouse's period of cohabitation with another where the recipient spouse maintains a "common household" for at least three months.  The definition

includes the sharing of a primary residence with the other person, as well as the factors set forth in G. L. c. 208, § 49 (d) (1) (i)-(vi). What each of these provisions has in common is a definition of a relationship that resembles, but is not equivalent to, a legal marriage. Cf. Charron v. Amaral, 451 Mass. 767, 770-771 (2008) (distinguishing between cohabitation and legal marriage). The existence of such a relationship has an effect on the spousal obligation of alimony.

Given the use of the term "cohabitation" in each of these provisions, and their similar purpose to permit an adjustment of the duration or amount of an alimony award, we conclude that the Legislature intended that it is only where parties share a common household, and are engaged in an economic marital partnership, that a judge has discretion to increase the length of a marriage, or to suspend, reduce, or terminate a general alimony award. We therefore conclude that a judge must consider the factors set forth in G. L. c. 208, § 49 (d) (1), which are determinative of whether the parties share a "common household," in order to ascertain whether the parties were participating in an economic marital partnership. These factors, which include a consideration of the parties' relationship as a couple and "economic interdependence of the couple or economic dependence of [one] person on the other," must be considered to ascertain whether the parties were engaged in an economic marital

partnership for the purpose of the alimony reform act.

Further, the act also establishes presumptive termination dates for general term alimony, which are calculated based on the length of the marriage.[10] A judge determining the appropriate duration of alimony payments may make a deviation beyond the time limits only if "the judge makes a written finding that deviation . . . is required in the interest of justice." Holmes v. Holmes, supra at 654. See G. L. c. 208, § 49 (b). Although a "judge has broad discretion when awarding alimony under the [alimony reform act],"[11] see Zaleski v.

---

[10] The presumptive time limits for payment of general term alimony for a marriage of twenty years or less are set forth in G. L. c. 208, § 49 (b) (1)-(4):

　　"(1) If the length of the marriage is [five] years or less, general term alimony shall continue for not longer than one-half of the number of months of the marriage.

　　"(2) If the length of the marriage is [ten] years or less, but more than [five] years, general term alimony shall continue for not longer than [sixty] percent of the number of months of the marriage.

　　"(3) If the length of the marriage is [fifteen] years or less, but more than [ten] years, general term alimony shall continue for not longer than [seventy] per cent of the number of months of the marriage.

　　"(4) If the length of the marriage is [twenty] years or less, but more than [fifteen] years, general term alimony shall continue for not longer than [eighty] per cent of the number of months of the marriage."

[11] The Alimony Reform Act of 2011 did not alter the broad discretion historically accorded to judges in making awards of alimony. See Zaleski v. Zaleski, 469 Mass. 230, 235 n.13 (2014)

Zaleski, 469 Mass. 230, 235 (2014), the judge must consider all relevant, statutorily specified factors, such as those set forth in G. L. c. 208, §§ 49 (d) and 53 (a). See Zaleski v. Zaleski, supra at 235-236.

Here, the judge concluded that the length of the marriage was eighteen years, and awarded general term alimony to Ellen for a durational period of fourteen years, a period consistent with a marriage of between fifteen to twenty years. See G. L. c. 208, § 49 (b). In determining that the length of the parties' marriage was eighteen years, the judge plainly rejected Christopher's assertion that he was nothing more than "a renter of sorts" during the period of the parties' cohabitation.

The testimony before the judge in this regard included statements of both parties that, during the period of cohabitation, they presented to their community as an "intact family"; Ellen called Christopher her "husband" and Christopher conceded that he "may" have called Ellen his "wife"; they gave each other rings to wear in place of their wedding bands; Christopher was able to see and have daily interaction with his children; he could participate in their activities within and outside of the home; and the family planned and took vacations together. Christopher also testified that, during the period of cohabitation, he and Ellen engaged in a "joint effort . . . to

(discussing legislative history).

figure out the children's schedule," although at times his work schedule took priority because he was the primary breadwinner. During this period, Christopher continued to pay Ellen $7,600 per month, the amount of the award under the first judgment, and Ellen paid the majority of the expenses of running the parties' combined household. At some point, around 2010, Christopher paid for certain improvements to the family home and began contributing towards the utilities. He did not pay an additional amount to Ellen designated as rent. The parties maintained separate bank accounts during both the period of cohabitation and their second marriage.

Based on the above, the judge concluded that, during the period of cohabitation, "the parties functioned exactly as they had during their previous marriage," with Christopher in the role of "the primary wage earner" and Ellen in the role of "the primary homemaker and caretaker for the children." The judge's findings of fact support his conclusion, based on the statutory factors, that the parties were engaged in an economic marital partnership and maintained a common household during their period of cohabitation. See G. L. c. 208, § 49 (d) (1) (i)- (vi). The parties presented themselves to third parties as a traditional family with a husband, wife, and two children; they were economically interdependent, with Christopher earning the majority of the income and Ellen primarily taking care of the

household and caring for the children; and they planned their lives together, in terms of both daily schedules and annual vacations.  The judge did not abuse his discretion in determining that the parties' relationship during the period of cohabitation before their second marriage was an economic marital partnership, rather than a landlord-tenant relationship.

Christopher argues that the judge's finding that an economic marital partnership existed was erroneous because Christopher continued to pay alimony to Ellen during the period of cohabitation, as required by the terms of the first divorce judgment.  He contends, in essence, that an economic marital partnership cannot be a product of a court order.  This argument misses the mark.  A judgment requiring payment of alimony does not contemplate a shared life; rather, alimony payments make it possible for a spouse to support himself or herself and the parties' children in a lifestyle similar to that which had been enjoyed by the family during the marriage, even though the spouse who had been the breadwinner is no longer part of the household.  See Pierce v. Pierce, 455 Mass. 286, 296 (2009) ("If a supporting spouse has the ability to pay, the recipient spouse's need for support is generally the amount needed to allow that spouse to maintain the lifestyle he or she enjoyed prior to termination of the marriage").

While it often may be the case that there is some measure

of mutual dependence and benefit enjoyed by formerly married parties where one party is paying the other court-ordered alimony, that alone would not convert court-ordered payments into an economic marital partnership.  But the situation is different where a party continues to make such payments after he or she returns to live in the former marital home with the former spouse and enjoys the benefits of daily family interaction and connection, and the parties present themselves to the community as married, as was the case here.  We conclude that there was no error in the judge's decision to include in the length of the parties' marriage the approximately five and one-half years that the parties lived together and maintained a common household.  This conclusion is supported by the judge's findings that the parties both "contributed to the economic marital partnership" during that time period.  The determination also is consistent with the Legislature's manifest intent to include within the length of a marriage that period of cohabitation during which the parties are engaged in an economic marital partnership.  See G. L. c. 208, § 48 ("the court may increase the length of the marriage if there is evidence that the parties' economic marital partnership began during their cohabitation period prior to the marriage"); G. L. c. 208, § 53 (a) (requiring consideration of, among other things, length of marriage, in determining appropriate form, amount, and

duration of alimony).

We turn to the length of the parties' first marriage.  The alimony reform act does not provide direct guidance on the calculation to be used where two individuals previously were married to each other, subsequently were divorced, remarried, and then were divorced a second time.[12]  As discussed above, however, the act expressly provides a judge with discretion to increase the length of a marriage for purposes of calculation of alimony where there is evidence that the parties' economic marital partnership began prior to the marriage during a period of the parties' cohabitation.  See G. L. c. 208, § 48.  Nothing in the act requires that the period of cohabitation that results in a "legal marriage" and "the parties' economic marital partnership" must directly precede the date of the marriage.  Id.  The Legislature could not have intended to exclude from the length-of-a-marriage calculation a previous period of time during which the parties were legally married (and thus presumably engaged in an economic marital partnership and

---

[12] We note that G. L. c. 208, § 49 (d) (2), provides that if alimony is reduced or suspended as a result of a recipient spouse maintaining a common household with another person, "alimony . . . may be reinstated upon termination of the recipient's common household relationship."  The next section provides:  "Nothing in this section shall be construed to permit alimony reinstatement after the recipient's remarriage, except by the parties' express written agreement."  G. L. c. 208, § 49 (e).  It appears from their context that these provisions do not implicate remarriage or cohabitation of the recipient and payor spouse.

maintaining a common household), while including a period of cohabitation that involves participation in an economic marital partnership. Such a result would be absurd. See Flemings v. Contributory Retirement Appeal Bd., 431 Mass. 374, 375-376 (2000) ("If a sensible construction is available, we shall not construe a statute . . . to produce absurd results"). Therefore, we conclude that the judge properly included the length of the first marriage in the calculation of the over-all length of the parties' marriage.[13]

Nothing in the act, however, supports a conclusion that a judge may include, as part of the over-all length of marriage, the time during which the parties neither were legally married nor engaged in an economic marital partnership. Here, the judge's only stated rationale for including in the over-all length of the marriage the period between the parties' first

---

[13] We reject Christopher's argument that a provision of the parties' 2004 separation agreement, whereby both parties agreed to "waive, renounce and relinquish . . . all and every interest of any kind of character which either may now have or may hereafter acquire in or to any real or personal property of the other, whether now owned or hereafter acquired by either," prevents the judge from including the time of the first marriage as part of the length of marriage. The 2004 separation agreement resolved claims arising out of the first marriage and divorce; it did not, and could not, contemplate claims arising from subsequent events, such as their second marriage and a second divorce. For the purpose of the second divorce, which occurred after the passage of the alimony reform act, the terms of the statute control the length of marriage. See Chin v. Merriot, 470 Mass. 527, 534 (2015) (discussing prospective application of alimony reform act).

divorce and the date they began cohabiting was the observation that "[t]he parties have been in a relationship, with only a brief period of separation, for eighteen years." Even accepting the judge's description of this fifty-month period as "brief" within the context of a relationship spanning eighteen years, it was improper to extend the length of the marriage by this period in the absence of any evidence that the parties were participating in an economic marital partnership during that time.

There was no evidence introduced that the parties' relationship during this period was different from any other two individuals who previously had been married and thereafter shared custody of their children, with one former spouse obligated to make family support payments to the other. Immediately following the first divorce, unlike their subsequent period of cohabitation, the parties did not share a primary residence, did not present themselves to their community or otherwise refer to each other as husband and wife, and did not plan their daily activities and schedules together. Merely paying court-ordered support, and having amicable arrangements for care of the children, does not, without more, define an economic marital partnership. We conclude that the judge erred in including this period as part of his calculation of the length of the marriage. For purposes of calculating alimony in

this case, the length of the parties' marriage does not include the time from the date of service of the divorce complaint in the first marriage in April, 2003, until the period of cohabitation began in May, 2007.

Ellen contends that, even if this period is excluded, the alimony award nonetheless may be affirmed because the judge was permitted to make a deviation from the presumptive duration of, as well as the presumptive limits on the amount of, a general term alimony award. See G. L. c. 208, § 53 (e). We recognize that the act authorizes a judge to make deviations in setting an alimony award based on factors including age, health status, inability to work full time in the future, and "any other factor that the court deems relevant and material." See id. The act, however, contemplates a deviation in the duration and amount of the alimony award, not a deviation in the calculation of the length of the marriage. See id. Although the length of a marriage is the central factor in establishing the limits of an alimony award, it remains a distinct concept that must be calculated independently from the duration or amount of alimony. See G. L. c. 208, § 48. Other than including a period of cohabitation during which the parties maintained an economic marital partnership, the alimony reform act affords no discretion to a judge in calculating the length of a marriage based on the factors listed in G. L. c. 208, § 53 (e), which

apply only to the amount and duration of alimony payments.

Moreover, while a judge has discretion to deviate from a presumptive alimony award, such a deviation must be made "upon written findings that deviation is necessary."  G. L. c. 208, § 53 (e).  See G. L. c. 208, § 49 (b); Holmes v. Holmes, 467 Mass. 653, 658 (2014).  Here, the judge made no written findings in support of a deviation, and did not state that he was adopting such a deviation.

Conclusion.  Because the alimony award was based on an incorrect calculation of the length of the parties' marriage, the judgment establishing the amount and duration of alimony is vacated.  The matter is remanded to the Probate and Family Court for further proceedings consistent with this opinion.  On remand, in light of the revised length of marriage, Christopher may seek reconsideration of the division of marital property and the allocation of educational expenses for the children.

So ordered.